## BERREYESA v. SCHULTZ—SCHULTZ v. BEASLY.

José and Sisto Berreyesa, in 1843, petitioned the Governor of California for a grant of eight leagues of land, known as "Las Putas," and in their petition represented that they were married, and had children, and also a considerable number of cattle and horses, and needed land on which to place them. On this petition, after a favorable report from his Secretary, the Governor ordered that a title issue to the petitioners for so much of the land as they could settle. No title issued upon this order; but for some unexplained reason the petitioners considered the concession which it directed as embracing four leagues of the tract solicited, and on the following day they presented a second petition, in which they stated that their families were very large, and included their parents, children, and brothers, and besides that there were more than one hundred uncivilized Indians in their neighborhood whom it was necessary to maintain, and for these reasons prayed a grant to themselves of the other four leagues. The report of the Secretary on this petition speaks of it as presented for the benefit of the petitioners, and of their parents, children, and brothers. On this petition a grant was issued, conceding to José and Sisto the entire tract, and declaring it to be their property, and imposing upon them the usual conditions. This grant recited that the grantees had petitioned "for their personal benefit, and that of their families, and that of their parents and brothers." It being contended by the appellants, from these facts, that the parents and brothers of the petitioners as well as petitioners were beneficially interested in the grant: Held,

First—That no valid argument in favor of the position of appellants could be drawn from the character of the first order of the Governor, because the grant which transferred the title was not issued upon it;

Second—That the second petition, and the report of the Secretary upon it, taken together, showed that the parents, children, and brothers, were referred to

only as inducements for enlarging the bounty of the Government to the petitioners, and not as distinct additional beneficiaries ;

*Third*—That the recital in the grant did not control the course of the title—that it only disclosed the inducements which operated upon the Governor to make the grant, and that the language of the operative clauses entirely excluded the idea that any other person than the two Berreyesas who petitioned were to become invested with the title ;

*Fourth*—That José and Sisto Berreyesa, the grantees, were invested by the grant with the full legal and beneficial title to the land, exempt from any trust in favor of the other members of the family.

The Mexican Regulations of 1828 required the applicant for lands, whether an *empresario*, head of family, or private person, to set forth in his petition to the Governor, " his name, country, profession, the number, description, religion, and other circumstances, of the families or persons with whom he wished to colonize," and though these particulars constituted considerations with the authorities in whom the granting power was vested, they did not in any respect control the course of the title against the operative words of transfer in the grant.

APPEAL from the Seventh Judicial District.

On the eleventh of February, 1842, José de Jesus Berreyesa and Sisto Berreyesa presented the following petition to the Military Comandante of Sonoma :

" *To the Señor Military Comandante of Sonoma:*

" José de Jesus Berreyesa and Sisto Berreyesa, married, with children, and residents on this frontier, in due form represent: 'that owning a considerable number of cattle and horses, and not having a tract of land on which to place them, suitable for their increase, they both together, equally, solicit the place known by the name of Las Putas, of the extent of eight square leagues.

" The place referred to is vacant, and does not belong to any individual; on the contrary, it lies in the neighborhood of the uncivilized Indians, and it is even the object of the subscribers to contribute to the civilization of the tribes in the neighborhood of said place.

" Wherefore, they pray your Honor to be pleased to give them permission to occupy the said land provisionally—meanwhile the necessary proceedings are being had to obtain the legal title from the proper authority—in which they will receive grace and favor,

admitting this on common paper, not having any of the corresponding stamp.

"JOSE DE JESUS BERREYESA, †

"SISTO BERREYESA. †

"SONOMA, February 11th, 1842."

On the same day—February 11th, 1842—the following order was made by the Military Comandante on the petition:

"SONOMA, February 11th, 1842.

"The parties to this petition may occupy the land asked for, and they shall present themselves to the Government for the proprietary titles.

"SALVADOR VALLEJO."

On the sixteenth of July, 1843, the same persons presented to the Governor the following petition:

"*Most Excellent Señor*:

"José de Jesus Berreyesa and Sisto Berreyesa, residents of Sonoma, and established in said point, before your Excellency, with the proper respect, and in due form of law, represent: That being both married, with families, and having a considerable number of cattle and horses, and needing a place or tract of land suitable for the security and preservation of their small property, they presented themselves before the Señor Comandante of this point, asking him to grant them permission to place their said property on the land known by the name of Las Putas—meanwhile the necessary proceedings were being had to obtain legal title—and having obtained said permission, as is shown by the accompanying document, we solicit your Excellency to be pleased to grant us the land indicated, which land is of the extent of eight square leagues, to which end a diseño of the land petitioned is herewith presented to your Excellency, hoping to receive from the goodness of your Excellency the necessary assistance for our numerous families, for the security of their interests, their subsistence, and well being.

"Wherefore, they earnestly pray your Excellency to be pleased

to accede to their petition, which favor they hope to receive, swearing that they do not act in bad faith, and whatever is necessary.

"Jose de Jesus Berreyesa, †

"Sisto Berreyesa. †

" Sonoma, July 16th, 1843.

" The foregoing is not written upon sealed paper, there being none in this place."

Upon this petition the Governor made an order, dated October 26th, 1843, directing the Secretary to report, and thereupon the Secretary made the following report:

" In consideration of the good character of the petitioners, from all the information I can receive, as well as on account of the time they have occupied the land for which they petition, and having built a house upon the same, and commenced other labors for the improvements thereof, all of which renders them worthy that your Excellency should accede to their petition, if the same should meet the approbation of your Excellency.

" This is all I can report in relation to the matter, in compliance with the superior decree of your Excellency of the date of to-day.

" Manuel Jimeno."

On the twenty-seventh of October, 1843, the Governor made the following order:

" Let the title issue for so much as they can settle, they not being permitted to sell or alienate the same, etc., marking out the boundaries."

On this order no title appears to have been issued.   For some reason or other, which is unexplained, the petitioners seem to have conceived the idea that under this order they could only obtain a title to four leagues of land ; and not being satisfied with a grant of that extent, on the next day, the twenty-eighth of October, 1843, they addressed to the Governor the following petition:

" *Most Excellent Señor :*

" José de Jesus Berreyesa and Sisto Berreyesa, residents of the frontier of Sonoma, and established on the rancho known by the

name of Las Putas, before the high justification of your Excellency, and in due form of law, present themselves, and say : That our family being so large, including also our parents, brothers, and our children, and counting also more than one hundred uncivilized Indians that surround us, and desiring to live all upon the same place, which we solicit, and the four sitios [four square leagues] which your Excellency has been pleased to concede us not being sufficient to contain us, since we need lands for our flocks and herds, and lands for cultivation, for, besides the subsistence of all our family, it is necessary to maintain the Indians, in order to avoid to some extent the robberies they are likely to commit.   Wherefore, we pray your Excellency to be pleased to concede us the other four square leagues, hoping that your Excellency will coöperate for our well being, we earnestly pray that you may be pleased to accede to our petition, in which we will receive grace and favor, swearing that we ask in good faith.

" JOSE DE JESUS BERREYESA,
" SISTO BERREYESA.

" MONTEREY, October 28th, 1843."

On the thirtieth of October, 1843, the Governor ordered the Secretary to report, which he did, on the same day, in these words :

" *To the Señor Governor :*

" The land petitioned for anew by the Señors Berreyesa for their own benefit, and that of their parents, children, and brothers, I understand can be conceded to them without any inconvenience, since, in consideration of the numbers composing all the families, and as the land cannot be divided, it being a cañada surrounded by hills, it may well be conceded in order that the persons referred to may occupy it in colonization, without being permitted to sell or alienate the same, and subject to the other customary conditions ; but the determination of your Excellency in the matter will be most proper.

" MANUEL JIMENO.

" MONTEREY, October 30th, 1843."

On the thirty-first of October, 1843, the Governor made an

order that, in accordance with the report of the Secretary, the title should issue with the conditions expressed; and on the third of November, 1843, a decree of concession was made as follows:

"MONTEREY, November 3d, 1843.

"In view of the petition with which this *expediente* commences, the foregoing reports, with all other matters necessary to be considered, in conformity with the laws and regulations on the subject, I declare the citizens José de Jesus and Sisto Berreyesa owners of the place named Las Putas, bounding with the hills (*lomeria*) surrounding the same Suyacaleur, Buli, and Queneltal, of the extent of eight square leagues.

"MANUEL MICHELTORENA."

And thereupon, on the same day, on the third of November, 1843, the following grant was issued:

"Manuel Micheltorena, Brigadier-General of the Mexican Army, Adjutant-General of the Staff of the same, Governor, Comandante-General and Inspector of the Department of the Californias:

"Whereas, the citizens José de Jesus and Sisto Berreyesa have petitioned for their personal benefit, and that of their families, that of their parents and brothers, the land known by the name of Las Putas, bounded by the range of hills, (*lomeria*) which surrounds the same, named Suyacaleur, Buli, and Queneltal, the necessary proceedings having been previously had, and the investigations made as required by the laws and regulations, in exercise of the authority conferred upon me, in the name of the Mexican nation, I have determined to concede to them the said land, declaring the same to be their property by these presents, subject to the approval of the Most Excellent Departmental Assembly, and under the following conditions:

"1st. They shall not sell or alienate the same, impose upon it ground rents, bond, or mortgage, or any other incumbrances, whatever.

"2d. They may inclose it without prejudice to the roads, crossings, and servitudes; they shall enjoy it freely and exclusively, devoting it to the use or cultivation which may be most convenient;

but within one year they shall build upon it a house, which shall be inhabited.

" 3d. They shall solicit the respective Judges to give them judicial possession, by virtue of this dispatch, by whom the boundaries shall be marked out, on the limits of which will be placed, besides· the landmarks, some fruit trees, or forest trees, of some utility.

" 4th. The land, of which donation is made, is of the extent of eight square leagues, a little more or less, as by the respective diseño. The Judge who may give the possession will cause the same to be measured in accordance with the ordinance, the surplus that may result to remain to the use of the nation.

" 5th. If they violate the conditions, they shall lose their right to the land, and it will be denounceable by another.

" In consequence whereof, I order that this, [document] serving them as a title, be held as firm and valid, and that registry be made of it, and that it be delivered to the interested parties for their security and further ends.

" Given in Monterey on the third of November, one thousand eight hundred and forty-three.

" MANUEL MICHELTORENA.

" MANUEL JIMENO, Secretary."

The first case, in which Berreyesa is plaintiff, is a bill in equity. The complaint sets forth that Nasario Berreyesa and Maria Antonia, his wife, having a large family of eleven sons (one of whom was the plaintiff) and three daughters, in the year 1839 settled on a rancho situated in the present county of Napa, and known as Las Putas, and which is particularly described in the complaint; that this land was possessed and occupied by the different members of the said family, with their herds, in common; that in October, 1843, whilst said occupation continued, Jesus and Sisto Berreyesa, two of the sons, petitioned the Governor for a grant of said rancho (which contained eight leagues of land) for the benefit of themselves, their parents, and their brothers and sisters; that in November, 1843, a grant of said rancho was made to said Jesus and Sisto Berreyesa, for the benefit of themselves, and also for the benefit of their father and mother, and brothers and sisters; that

after the said grant the family continued to occupy and possess the said rancho with their flocks and herds; that they claimed it in common, and improved it in common, and that Sisto and Jesus Berreyesa always recognized the interest in common of the other members of the family; that afterwards, and at different dates, sundry members of the family died intestate and without issue, leaving thereby their interest in said rancho in the survivors; that Jesus and Sisto Berreyesa, the two brothers who petitioned for the grant, assigned their interest to their wives, Maria Antonia, and Maria Nicolasa Higuera, who, along with their husbands, presented the claim to the Land Commission, who confirmed it; that said Jesus and Sisto Berreyesa, and their said wives, conveyed to Thorn and Treat, with full notice of the premises, and whilst the plaintiff was in possession in common with the other members of the family as aforesaid; that the defendant, by virtue of mesne conveyances, and with like notice, acquired the title of Thorn and Treat; that in virtue of his title so acquired he pretended and claimed to own the entire rancho—was endeavoring to obtain a patent for the land from the United States to himself exclusively, and threatened to bring a suit to dispossess the plaintiff from the land. The complaint also contained copies of all the documents set forth or referred to in the above statement of facts, and prayed the Court to decree that the defendant held as a trustee for the use of the plaintiff to the extent of his interest; that the defendant should execute to the plaintiff a deed for said interest, and that in the meantime he should be restrained by injunction from causing a patent to be issued.

To this complaint the defendant demurred, and the Court having given judgment on the demurrer for the defendant the plaintiff appealed.

The suit of *Schultz* v. *Beasly* is an action of ejectment for the same rancho. Beasly defends by setting up: first, the same case set forth in his complaint by Miguel Berreyesa; and second, the further fact that in 1845 he intermarried with Clara Berreyesa, a member of the said Berreyesa family; that after his said marriage he entered on said rancho with his wife, the said Clara, and from then till now (and living with her and their children) had been

upon said rancho in virtue of his said wife's interest therein in common with the other members of the said family of Berreyesa. The prayer of the answer was for the same relief as was asked for in the complaint of Miguel Berreyesa. The plaintiff Schultz demurred to the answer of Beasly, and the Court having given judgment on the demurrer for the plaintiff, the defendant appealed.

*Hepburn & Dwinelle,* and *Baldwin & Haggin,* for Appellants.

That the grant made on the third of November, 1843, was founded entirely on the second petition and not on the first, is shown by the fact that it recites in the first sentence that it was made on the petition of Jesus and Sisto Berreyesa, who had petitioned for the land for their personal benefit, that of their families, and "that of their parents and brothers and sisters;" the parents, brothers, and sisters not being mentioned in the first petition.

Here, then, we have a petition for eight leagues of land by two persons, who ask for it for themselves. The eight leagues are refused, but as much of the eight leagues as they can stock is offered. This offer instead of being accepted and prosecuted to a grant, is declined, and a new petition is presented asking for the same lands, not for themselves but for themselves and others, who together could stock and occupy it. The report called for on this petition, recommends the grant specifically and carefully on the grounds set forth in the second petition: "In consideration of the number composing all the family, who might occupy it in colonization." The grant follows, and shows on its face that it was made for the reasons given in the report; that is to say, because Jesus and Sisto Berreyesa had petitioned for the eight leagues "for their personal benefit, that of their families and that of their parents and brothers and sisters." They could not stock and occupy the eight leagues themselves, and it was refused to them; they could stock and occupy it, aided by their parents and brothers and sisters, and it was granted "in colonization."

In the judgment of the Supreme Court of the United States (18 Howard, 548) colonization means immigration or settlement "in numbers;" and the Mexican Regulations of 1828, declare that the lands shall be granted to "contractors, (*empresarios*) families, or

34

private persons, for the purpose of cultivating and inhabiting them."
(See Articles 1, 2, 5, 16, Rockwell, 453, 454.)

"Families" are as much objects of the bounty of the Government
as "private persons." Lands are to be given to both for the same
reason, "cultivating and inhabiting them." In this case the pri-
vate persons not being able to cultivate and inhabit the whole of
the tract asked for, it was refused; but to the families who were
able to occupy and cultivate it, it was granted. Shall the fact that
this grant was asked for by two in the name of all, restrict the title
to two, and defeat the title to all? This would not only be against
natural equity, but contrary to the colonization law itself, which in
order "to combine the possessions of families," gave a preference
for grants of public lands adjoining proprietors, to the children and
relatives of the proprietors. (See Rockwell, 454, sec. 16 Regula-
tions of 1828.)

It is familiar that under the Mexican system, the Alcalde, in a
summary way, dispossessed intruders upon lands which had been
granted. Could Jesus and Sisto Berreyesa, after their parents
and brothers and sisters went into possession under this grant, and
made improvements, have invoked the aid of the Alcalde to turn
them out? The title being granted equally for the benefit of all
the family, can it be doubted that the other members of the family
could invoke the title to show that they had as good right to the
possession and enjoyment of the land as Jesus and Sisto? Occu-
pancy and cultivation being the source of title of all, and being paid
by all, should be shared by all. Suppose Jesus and Sisto had
prosecuted their first petition to a grant; had obtained a grant for
as much land as they could stock, and under this grant had taken
possession of a league and occupied it. The seven leagues would
then have been public land, and the parents and brothers and sis-
ters could have asked for it, and, under the colonization law, have
had a preference for it. This is precisely what they have done,
only in a different way.

Again: by the eleventh article of the Regulations of 1828, lands
granted are liable to be denounced and regranted to others for non-
performance of the conditions of settlement. Suppose Jesus and
Sisto Berreyesa had abandoned their possession and occupancy of

this rancho, but the rest of the family had remained; would the land have been subject to denouncement? If it would, then the parents and brothers and sisters would lose the possession and occupancy of lands the right and title to which was dependent on possession and occupancy. But the case at bar is even stronger than this; for Schultz, who claims the whole rancho, stands here as the assignee of Jesus and Sisto Berreyesa; and that they have abandoned their possession is proved by the fact that their assignee is sueing for it. So that if the Court give judgment for Schultz, they will determine, in effect, that Jesus and Sisto Berreyesa, who have not performed the conditions of the grant, shall turn out their co-tenants who have performed them. Mr. Justice McLean has said in the famous Bastrop case, that "the remuneration given for colonization in the Spanish colonies was uniformly a grant of lands." (11 Howard, 660.) Here the land has been granted by the Government "in colonization," (those very words being used, *ex industria*, in the title papers) yet the proposition made to the successor of that very Government is, to confirm the grant as a colonization grant, but to take away the land from the colonist.

When the Government denounces a rancho, it is always on the petition of some colonist, who sets forth that the land, though granted before, has been abandoned; is vacant and unoccupied, and that he, the petitioner, will occupy and improve it if granted to him. The motive then, of the Government in making a denouncement is the same as in making a grant, to wit: occupation and improvement. How absurd then to say that the Government would denounce or regrant (for regranting and denouncement are the same thing) a rancho for the purpose of occupation and improvement, which rancho was already granted, occupied, and improved. The power to denounce is derived from the same source as the power to grant, to wit: the law of 1824; and according to this law the power to denounce is not absolute but conditional, and dependent on the fact of abandonment; so that where there is no abandonment there can be no denouncement. From this it results that this land having been continuously occupied by this family, the Mexican Government could not have deprived them of it, even if it had been so disposed; and would therefore have been bound

to extend the "definitive title," if it had been asked for. Suppose, then, that this definitive title had been asked for by Jesus and Sisto Berreyesa for themselves, and by the family for all, to which of the two would the Government have given it? The utmost that Jesus and Sisto could say in their favor would be, that they had settled and occupied; but this they offered to do in their first petition for a grant; and which was refused to them for the reason that their occupation alone was insufficient. On the other hand, the family could say that this land having been refused to two because the occupation of two was insufficient, was given to all, on the condition that all would occupy; that all had occupied, and therefore, the Government, having received the consideration from all, should extend the title to all.

To say nothing of honesty, policy would require the Mexican Government to reason in this way; for if they gave the title to Jesus and Sisto, to the exclusion of the other members of the family, then Jesus and Sisto could turn the others off; and thus the Government would find itself in the ridiculous position, first: of granting to two colonists the identical rancho, which because there were only two, it had refused to grant them; second, of being false to meritorious colonists who had been true to it; and third, of thwarting by its own acts the great motive and policy of the whole system of grants, to wit: colonization. The importance of this view of the case will be seen, when it is recollected that one of the modes of colonization provided for by the law of 1824, was by *empresario*. This grant, instead of being a grant of eight leagues to a family, might just as easily have been a grant of a hundred leagues to an *empresario* upon the condition of settling thereon a hundred colonists. If in such a case the Government should prefer the *empresario* to the colonists, and issue the definitive title, not to them, but to him, the *empresario*, becoming thus the owner of the land, could immediately turn round and expropriate the colonists, and thereby entirely defeat the object and policy of the Government in making the grant.

The Bastrop case, already cited, shows that this cannot be done. In that case the definitive title was given to the colonists, and not to Bastrop; and to each in proportion to his settlement. This was

done at first by the Spanish Provisional Government; and the United States, when they succeeded to the Spanish Government, pursued the same course. (11 Howard, 648, 651, 652.)

Wherefore should the Berreyesa colonists, who have always been, and still are, in possession, be denied the justice which was accorded to the Bastrop colonists? This action of ejectment by Schultz, is in legal effect a suit by Jesus and Sisto, to oust their co-tenants and co-colonists; and as the Mexican Government would not entertain it, so neither should ours, which has succeeded to its obligations as well as its rights.

The unimportance of the person to whom a grant issues, is strongly shown in the case of the Arguello claim to the Rancho Las Pulgas. In that case, José Estrada representing himself as the Executor of Don Louis Arguello deceased, on the twenty-seventh of October, 1835, petitioned the Governor for a grant of the Rancho Las Pulgas to the minor children of said Louis Arguello, to wit: José Ramon and Luis, Maria Concepcion and Maria Josefa, on the ground that the father had been the owner of the land since 1800, and that the titles had been mislaid. On this petition, after taking testimony to show that the minors were Mexicans and had sufficient stock to settle the rancho, the Governor, in November, 1835, made a grant, in which after reciting that Estrada had petitioned for the benefit of the minors, he declares and vests the title thus: " Using the faculties which are conferred on me, by decree of this day, I have come to declare him the owner thereof by the present letters." * * " In consequence I order that the present, serving as a title to him, be held firm and valid, be recorded in the book thereto corresponding, and be delivered to the petitioner for his security and other purposes."

This is as plain a grant to Estrada as can be made, but as he asked for it for others, and as the others for whom he asked it, went into possession of it, and lived on it, the Court had no difficulty in confirming the claim to them and not to him. (See the grant in this case, *United States* v. *Arguello*, 18 How. 542.)

As a question of authority, the case is also plain. The doctrine of the English law is, that " any expression manifesting an intention that the donee of property is not to have the beneficial

enjoyment of the whole or some part of it, will be binding on the conscience of the trustee, and will, in equity, exclude any claim by him to the beneficial interest." (10 Ves. 537.) For this purpose, it is by no means necessary that the donee should be expressly ·directed to hold the property to certain "uses," or "in trust," though such words being definite and technical would be properly employed. That there is no magic in the words is a rule of equitable construc-. tion. Any expressions which show a clear intent to create a trust will have the effect. (1 Myl. & Craig, 401.) Thus, where a gift in a will is expressed to be "for the benefit" of others, or to be at the disposal of the donee "for herself and children," etc., it is a sufficient declaration of the trust. (Hill on Trustees, 65, 66.)

It is a well settled rule of the English law, that it is not necessary for the *cestuis* to be expressly named, or that the trusts should be expressly declared in the same instrument by which the estate is granted. "All persons who are capable of taking an interest in property at law, may to the extent of their legal capacity, and no further, become entitled to the trust of such property in equity. The beneficial interest in property may also become, and frequently is, vested in objects as *cestuis que trust*, whose existence is not recognized at law." (Hill on Trustees, 51, 52.) "It is not necessary to the creation of a trust, that a *cestui que trust* should be named, or in being at the time." (Hill on Trustees, note I.) So in regard to the legal capacity to convey in trust, "It may be broadly stated, that every person who is capable of making a valid conveyance of property of any description, has also the power of attaching such limitations or declarations to the act of disposition, as will convert the person taking the legal estate into a trustee for the parties to whom the beneficial interest is given." (Id. 45.) Nor is it necessary that the declaration of the trust should be contained in the same instrument, which vests the legal estate in the trustee." (1 Cox, 1; 2 Myl. & Craig, 684.)

It is not indispensable that the declaration should be made by a formal deed or will. "A simple letter or memorandum, or any writing of a similar untechnical and informal character, will be sufficient, if it clearly express the gift to lie in trust, and sufficiently connect the trustee with the subject matter of the trust." (Hill on Trustees, 64.)

Such a declaration of the trust is sufficient under the Statute of Frauds even.   Prior to the Statute of Frauds (29 Charles II) uses might have been declared by parol; at least in all cases of feoffment by livery.   (4 Cruise's Dig. ch. 12, p. 149.)   And even in case of a transfer of the freehold by fine or recovery (which was an assurance by matter of record) ; though a trust, when intended, must have been declared in writing, yet it was not necessary that it should be so expressed at the time.   Whenever a fine is levied and a declaration of the uses of it is afterwards executed, the fine and declaration of uses will be considered as one assurance.   (5 Cruise's Dig. 216 ; *Doe* v. *Whitehead*, 1 Doug. 45.)

In this case, however, there can be no mistake as to the character of the grant.   The trust is stamped upon the face of the title papers.

*W. C. Wallace* and *A. P. Crittenden*, for Respondent.

There is nothing in the last petition which intimates an intention on the part of the applicants to ask for the land in the name of any one but themselves, or to ask a grant in any such form as would give an interest in the land to any other person.   Its representations are made to meet a supposed objection in the mind of the Governor that the parties were asking for more land than, under the Regulations of November 21st, 1828, they would be entitled to receive, in view of the number of their families, and their circumstances.   And they meet that objection by the showing of the petitioners that their families included not only their wives and children, but their parents and brothers, and numerous Indians, all of whom the petitioners had to support.   These circumstances are required by the second article of the regulations to be stated, and they are precisely those which it was intended should influence the Governor in determining upon the quantity of land to be granted.

The report of the Secretary speaks of this petition as one for the benefit of the applicants, their parents, children, and brothers. And such it undoubtedly was—for all those who constituted a portion of the families of the applicants would derive a benefit from the grant, because it would give to the applicants the means of supporting all those who were dependent upon them.   And it is

in this sense, and no other, that the grant itself speaks of the petition of José de Jesus and Sisto Berreyesa, as one for their personal benefit, that of their families, and that of their parents and brothers. The idea of the appellants that, because of this recital in the report and the grant, all those referred to as persons to be benefited must have a direct interest in the land, and occupy the position of grantees, is untenable, either upon reason or authority. (Scott v. Ward, 13 Cal. 474 ; Frique v. Hopkins, 4 Mart. N. S. 214.)

Neither in the petition, nor the report, nor the grant, is there any distinction made between the families and children of the grantees, and the parents and brothers of the grantees. The same phrase embraces them all. In the petition the grantees say that their own families are large because they include them all, and in the report and grant it is recited that the petition for the land is for the benefit of them all. How can any distinction be made between them ? Can the parents or brothers have any different, or higher, or better right than the children ? Yet this Court has decided that the children have none.

The appellants' argument necessarily runs into an absurdity, and no case can more clearly illustrate it than the present. The uncivilized Indians, more than one hundred of them, are also represented in the petition to be part of the family of the petitioners, and are equally with the parents and brothers to be benefited by the grant. And upon the principle contended for by the appellants each one of them could claim to be an owner of the land.

There is no more ground for contending that this grant was not made exclusively to José de, Jesus and Sisto Berreyesa than there would be if the " moving cause," instead of being the unusually large number of persons composing the family of the petitioners, as shown by their second petition, had been a very great increase of their stock between the date of the two petitions. The quantity of land to be granted is to be proportioned both according to the number of persons to be indirectly benefited and the circumstances of the grantees—that is, the nature, kind, and amount of property they have. Upon both these elements depends the extent of the land which the grantees can use, and which therefore should be granted to them. It is so declared in article second of the regulations.

The error of the appellants' argument results from confounding the form, nature, and character of the grant with its "moving cause"—the inducements on which it was made. In the case of *Scott* v. *Ward* (13 Cal. 477) it was urged, as here, that the recital in the grant—that the grantee solicited the land "for his personal benefit and that of his family"—ought to control the operative words of the grant. The Court denied this proposition, and held otherwise. In that case the recital was untrue, but that fact does not diminish the force of what is said by the Court on this point. The recital is a mere formula, used in every grant, whether applicable or inapplicable to the facts of the case. The Court says: "The recital was probably taken from the usual forms in which grants were written; it certainly was not inserted or intended to have any influence upon the direction of the title. The term 'family' is not limited to the husband and wife. Alviso had, at the time, several children by a previous marriage, and if the use of the term in the recital can have any effect upon the direction of the title, it is difficult to see why those children might not claim to have received an interest in the property equally with the wife, or the community existing between the husband and wife. Such an effect was never supposed to exist, it is believed, by any one."

Yet in this case the recital is relied upon to show right, not only in the children, but in more distant relatives, and necessarily in the one hundred or more unnamed and uncivilized Indians, all of whom constituted the "family" of the petitioners.

The question here is one of construction. What was the intention of the Government? Was it to grant the land to José de Jesus and Sisto Berreyesa alone, or to grant it to them in common with all their relatives, and the hundred or more uncivilized Indians? In both petitions the applicants ask for the land for themselves alone. The report of Jimeno is that it can be conceded to them, and not to them in connection with anybody else. They, and they alone, are the persons "referred to" who may occupy it in colonization.

The title is directed by the Governor's order to issue "in accordance with the Secretary's report." In the decree of concession, which is declared to be made "in view of the petition," and the

"foregoing reports," the Governor declares "José de Jesus and Sisto Berreyesa owners of the place." In the grant the Governor, reciting their petition, declares that he has determined to concede to them the said land, declaring the same to be their property. And all the conditions refer to them alone. They are not to alienate nor incumber it; they may inclose it; they shall enjoy it freely and exclusively, devoting it to the use which may be most convenient; they are to build a house upon it; they shall solicit the juridical possession; if they violate the conditions they shall lose their right; and the document is to serve them as a title, and to be held firm and valid. Language could not be used which would more absolutely exclude the idea that any other person than José de Jesus and Sisto Berreyesa were to be owners of any part of the land. How can they be owners, and enjoy the property "freely and exclusively," and yet their families, parents, brothers, and Indians, be also part owners?

The appellants' brief cites sundry authorities upon the question, how and by what words a trust may be created. We do not propose to examine them. They relate to trusts under the common law, and are inapplicable in considering the construction of an instrument made in California in 1843 under the Spanish law, which discountenanced, if it did not prohibit, the creation of any estate in trust. (2 White's Recop. 181; *Gortario* v. *Cantu*, 7 Texas, 35.)

For a further and all sufficient reason it is unnecessary to enter upon any review of these authorities, with a view to determine to a nicety what words will and what will not create a trust. There must be some intention manifested by the words of a grantor that the whole beneficial interest in the property granted shall not vest in the grantee. And we are content to submit this case on the proposition, that no such intention appears from the *espediente* and grant in this instance; but, on the contrary, the manifest will and intention of the grantor were to grant the property to José de Jesus and Sisto Berreyesa, absolutely and exclusively. We do not see how any authorities can help the appellants, unless they go to the extent of holding that a trust may be made by the judgment of the Court, though it was never declared by the grantor, nor intended by him to exist.

The appellants seek to derive some support for their claim from the expression made use of in the report of Jimeno of the thirtieth of October, that the land " may well be conceded, in order that the persons referred to may occupy it in colonization, without being permitted to sell or alienate." They assume that the " persons referred to " are " all the families ;" that there is some distinction, under the colonization law and regulations, between grants to individuals and grants to families ; that the land was refused the two individuals, José de Jesus and Sisto Berreyesa, because they were not able to cultivate and inhabit it all, but was granted to the several families because they could occupy and cultivate it ; and they ask whether the fact that this grant, asked for by two in the name of all, restricts the title to two and defeats the title to all ?

To this we reply : First—That, as we have before stated, and as is clear from the perusal of the petitions, the two never asked for the land in the name of all, or in anybody's name but their own. Second—That, though it were conceded to have been refused the two applicants when they first asked for it, it was subsequently granted to them, when they explained to the Governor how numerous were the families and dependents for whom they had to provide ; and it was never granted to the " several families " at all, but only to José de Jesus and Sisto Berreyesa, exclusively. Third—That the expression in the report—" persons referred to "—relates only to the two petitioners, as is apparent from the whole report, and from the subsequent action of the Governor, in making the grant, " in accordance with " the report, to the two petitioners alone, and in imposing upon them the restriction, recommended by the Secretary, in regard to the power of alienation. Fourth—That even if it be otherwise, and the " persons referred to " intended " all the families," and it was the recommendation of the Secretary that the grant should be made to the petitioners with a view that " all the families " should continue to occupy the land, yet no one would have any right in the land, or be an owner of any part of it, but the two grantees named—for the grant must control, and it constitutes the two the owners of the land. And this would be so, even if the intention were clear from the grant itself that the occupation of all the families should continue, for the grant being made to the

two petitioners alone would contemplate only the continuance of the occupation of all the families under such arrangements and contracts as might be made between them and the grantees.

We would refer the Court to opinions delivered in two cases, and which support our views. The *espediente* and grant of John A. Sutter may be found in 10 Cal. 502–504. In his petition, he states his object in asking the grant to be the establishment of twelve families; in the grant, it is recited that he had asked the land for his personal benefit, and that of the twelve families; and the land was granted to him "for himself and his colonists." The Board of Land Commissioners confirmed the grant upon reasons which entirely support our position in the case at bar. And in their opinion the Supreme Court of the United States seems to have acquiesced. (*United States* v. *Sutter*, 21 How. 177.)

In the case of the *United States* v. *Weber* a grant of similar form was passed upon. It was made to William Gulnac, who in his petition represented that he was a man of family, and had so many head of cattle and horses, specifying the number, and that there were other persons of his class who bound themselves to be in his company for the purpose of forming a kind of pueblo in the country. In order to carry this arrangement into effect, and for the security and increase of his own property and that of the persons referred to, he prayed a grant of eleven leagues. The Secretary reported that it would be proper to know whether the land Gulnac asks for is for the formation of the colony he mentions, for in that case it appears necessary that the names of the persons who form it should be expressed, in order that in the title it may be explained that the land is for the benefit of all, and that if he petitioned for himself the extent was very great. The Governor then ordered that Gulnac should say whether he asked for the land for the colony, and in that case the title should issue, and should mention the names of the partners.

Without any further representation from Gulnac, a decree of concession was made to him, "for his own personal benefit and that of his family, and also that of eleven other families." Upon this decree a grant was made, which recites that Gulnac has asked for the land "for his own personal benefit, for that of his family, and

eleven other families," and granting the land to Gulnac, declaring him the owner, and containing precisely the same clauses and conditions as are contained in the grant to José de Jesus and Sisto Berreyesa.

In determining the nature of this grant and its legal effect, the Land Commissioners say: "The recital of the Governor in the grant, that the said Gulnac had solicited the grant for his own personal benefit and that of his family, and that of eleven others, carries with it no benefit to the families, inasmuch as no particular families are named; and none can claim its benefits except the family of Gulnac, and they only so much as the law would assign to them by way of inheritance on the decease of Gulnac. The grant is to him (Gulnac) declaring to him the ownership. There is nothing in the grant that would indicate a design on the part of the grantor to pass any particular interest to any one but Gulnac; but to pass the whole title to Gulnac, and leave him to contract with whom he pleased to settle the land, and on such terms as might suit him. The grant then was to Gulnac." And to the same effect was the opinion of Judge Hoffman. (1 Hoffman, 126.)

The twelve families referred to in the Sutter grant, the eleven in the Gulnac grant, and " all the families " mentioned in the grant to José de Jesus and Sisto Berreyesa, could occupy the land " in colonization," only in the same way, not in virtue of any ownership derived from the grant, but under the grantees, and through such arrangements as they might make with the grantees. It might well be questioned whether even this much was contemplated by the Government in the present case.

*Counsel for Appellants,* in reply.

The entire argument for the respondent Schultz, amounts to this: that the facts set forth in the petition, in regard to the parents and brothers and sisters, considered in the report of the Secretary, and recognized in the grant, are mere inducements to the grant, and that the legal title passed to the grantees entirely unaffected thereby.

To this we reply that this proposition is true in one sense, and in another sense it is not true. If the petition of Jesus and Sisto

Berreyesa was wholly their own act, and made by themselves alone, and for their ·own benefit exclusively, and without any privity or agreement with their parents and brothers and sisters, then the averments of the petition, reports, etc., were mere inducements to the grant, and the title passed to Jesus and Sisto Berreyesa discharged of any equity in favor of the parents and brothers and sisters. If, on the contrary, at the time this petition was presented, it was the intention of the entire Berreyesa family to ask for the land in common, and live on it, and hold and enjoy it in common, and Jesus and Sisto Berreyesa, in presenting the petition, did it with the knowledge, consent, and coöperation of the parents and brothers and sisters, and with the intention and understanding not to acquire it for themselves alone, but for all the members of the family in common, then the title passed to Jesus and Sisto Berreyesa, but charged with an equity in favor of each of the members of the family for an undivided share. This last proposition is the proposition of the pleadings and the *espediente*.

There is no analogy between this case and *Scott* v. *Ward*. In that case Alviso acted for himself alone, and with the intention to get the land for himself alone ; whereas, in this case, Jesus and Sisto petitioned for the land for themselves in common with others, and with the intention of obtaining it for themselves in common with others. This is shown by a common entry before the grant, by a common holding and a common improvement after the grant for upwards of twenty years, and by the title papers themselves in connection with the acts of the parties.

If the case stood on the *espediente* alone, there might be some ground for the argument which has been pressed with so much boldness by the counsel for the respondent ; but in connection with the acts and intentions of the parties, which for good reasons he has kept studiously out of sight, it loses its force. We dispute nothing which has been decided in *Scott* v. *Ward*, in the Sutter case, or in the Weber case. *Scott* v. *Ward* would be an authority for Schultz, if Alviso having children of his own who were owners of stock, had proposed to them to join their stock to his, and settle on the land, he to petition for it in his own name, but for common account. If in such a case the Court had denied the claim of the

children, the authority would have been in point against us.   If Maria Luisa Peralta, having cattle of her own, and Ignacio Alviso having cattle of his own, had agreed to marry, to settle on a ranch, and obtain a grant therefor through Alviso, and in his own name, but for joint account, then the case of *Scott* v. *Ward* would be like this ; and then, it is submitted, that the equity of the wife would not have been denied.   But, instead of that, the decision amounts only to this : that a man's family have no interest in his grant though the fact that he had a family may have been the reason why he obtained it.   To have decided the case differently would have been mere robbery ; for a man's status or quality of married man is as much his own as his cattle.   But the cattle of a man's parents and brothers and sisters are not his own ; and if the parents and brothers and sisters put their cattle into a common stock, and their persons into a common settlement, in order to obtain a common rancho, the one in whose name it issued cannot be honest and deny the rights of the others ; most of all, after they have enjoyed, and he has acknowledged them, for more than twenty years.   As between the Government and the petitioner, the colonists to settle, and the cattle to stock, the rancho, may be mere inducement to an act which when made may still be a donation.   But as between the petitioner and his co-colonists, the settlement and the cattle being the means of obtaining the grant, and being used by him for that purpose for the common benefit, the interest or share of the co-colonists in the donation is as much a purchase as if it had been paid for in gold.

It is in this connection that the facts presented by the *espediente* are so important.   Jesus and Sisto are offered what land " they can stock " (settle).   This is what they want, but not what the family want.   The family have stock as well as they ; the family are living on the rancho as well as they ; and they " desire all to live on the same place which they (we) solicit."   Therefore Jesus and Sisto re-petition for the land, setting forth these facts.   On this petition Jimeno, " in consideration of the number comprising all the families," reports that the land " may well be conceded, in order that the persons referred to may occupy it in colonization."   On the coming in of the report, the Governor ordered that " the

title issue in accordance with the report of the Secretary;" and the grant shows on its face that this order was obeyed. We say then that the consideration for this grant, that is, the means for obtaining it, was furnished, or paid, by all the family in common, and that they are therefore entitled to the land, share and share alike.

To hold otherwise is to disregard the plain language of the *espediente*, which says it may be granted " in consideration of the number comprising all the families." From the beginning it was known that Jesus and Sisto had families, for they recite the fact in their first petition. But the Governor, in the face of this fact, refused the grant, except to the extent that Jesus and Sisto could stock (settle) it ; and it was not until the large colonization set forth in the second petition, was promised, that he made the grant ; and when he did, it was " in consideration of the number comprising all the families." The acknowledgment of the source of the title is confirmed by the acts *in pais* of the parties interested, for more than twenty years. The second petition asserts that the family wanted all the land for their herds and their sowings, and that they all wanted " to live on the same place." The facts are that they were then on the place ; that some of them lived and died there, and that the rest lived there and are there still. Till the eleventh of January last, when Schultz (who bought with full notice, and when both the plaintiff Berreyesa and the defendant Beasly were in possession) brought his ejectment against Beasly, the title has never been questioned. If for no other reason, the assignee of Jesus and Sisto Berreyesa should be estopped to deny a claim which rests upon an adverse possession acknowledged daily for upwards of twenty years. How, in the face of the petition declaring that the land is asked for, for the benefit of the family, and in face of the acts of the petitioners giving the family the benefit of it for nearly a quarter of a century, can the grantees or their assignees deny it ?

In *Trevino* v. *Fernandez* (13 Texas, 630) the lands in question were denounced by two brothers, Bartolome and Eugenio Fernandez, and the title recited the payment of the price by both, and the officer was ordered to put the grantees in possession. In doing

this he, the officer, extended the title to Bartolome alone, and it was objected on the trial that this defeated Eugenio's right. The Court overruled the objection and said: " He," the officer, " had no authority to depart from the grant or to deprive one of the grantees of his right ; and his act, placing only one in possession of the whole of the lands, must be regarded as inuring to the joint benefit of both."

Here, upon the same principle, the grant though issued to two, having been paid for by the family, will inure to the use of the family. And the same result would have followed even though the *espediente* had not mentioned the family, or the Governor had never heard of them. Shall it be said, then, that the brothers and sisters are to fare worse because they are mentioned, than they would have fared if they had not been mentioned ? It being borne in mind that there is no question to whom the legal title passed, but only in whom the beneficial interest is vested.

The counsel has also referred to the grant to Gulnac, which was assigned by him to Charles M. Weber. Though that case was probably not well decided, it nevertheless does no damage to this. The Land Commissioners, it is true, decided that the grant was to Gulnac ; but they say also that Gulnac was free " to contract with whom he pleased to settle the land, and on such terms as might suit him." This is precisely what was done by José and Sisto with the other members of the Berreyesa family. The land was to be held in common to protect a settlement in common already made. And in view of the treaty of Guadalupe Hidalgo, this Court will be slow to refuse to execute an agreement of this sort when the fourteenth article of the law of August 18th, 1824, expressly guarantees the contracts which *empresarios* may make with families, provided they are not contrary to the laws. Indeed, the Land Commission has vindicated the rights of the co-colonists in this very case. In the case of *Justo Larios et al.* v. *The United States*, which was a claim by the eleven settlers on the Gulnac grant for a part of it, the Commissioners in delivering their opinion said : " If the claimants in the present case are entitled to an equitable interest in the land, a confirmation to Gulnac or his alienee, Weber, would not affect their right, but would create a trust in their favor

to the extent of that contract which might be legitimately asserted before the local tribunals of the country."

As for the Sutter case, to which the counsel has also referred, it is perfectly evident from the *espediente* and all the facts, that the enterprise was Sutter's own, and that the families who followed him were mere dependents with whom he was free to make such arrangements as he saw fit.    But in this case and Gulnac's case, the whole proceeding, from its initiation to its consummation, was not a separate, but a joint enterprise, in which all were equal.    The unanswerable proof of this is, that the settlement preceded the petition, and continued after the grant, which in neither case would have been made, as appears by the *espedientes*, but for the settlements. Even in the Sutter case, the Land Commissioners, in delivering their opinion, took pains to declare that the grantee in making settlements, " was at liberty to make such contract with his settlers as might be mutually agreed on between them, provided they were not contrary to the law of the land, or inconsistent with the purposes and intent of the grant."

But here it is admitted that all the brothers and sisters occupied as tenants in common before the grant was made, and that they have ever since occupied as such.    Surely this would raise a conclusive presumption, in the absence of any other evidence, that the two grantees who received the legal title agreed that the interest of each brother and sister should be that of an equal tenant in common.

FIELD, C. J. delivered the opinion of the Court—COPE, J. and NORTON, J. concurring.

These two actions turn upon the same question, and by stipulation of the parties have been presented and argued together.    The first is a bill in equity to subject the property held by the defendant to certain trusts in his hands, and to compel the execution to the plaintiff of a deed of an undivided interest therein.    The second is an action of ejectment, to which the defendant therein sets up as an equitable defense substantially the same matters which are urged for relief in the first action.    A demurrer to the complaint in the first case, and to the answer in the other, was sustained, and judgments entered thereon.

As appears from the documents annexed to the complaint, and constituting part thereof, in July, 1843, José and Sisto Berreyesa presented a petition to the Governor of California for a grant of land known by the name of Las Putas, of about eight leagues in extent, referring in their petition to a previous provisional permission to occupy the same given by the Military Comandante of Sonoma. Upon this petition the Secretary gave a favorable report, and in October, 1843, the Governor made an order that a title issue to the petitioners for so much of the land as they could " settle." It does not appear that any title was ever issued upon this order, but for some reasons, which are not stated, the petitioners seemed to have considered the concession which it directed as embracing four leagues of the tract solicited; and on the following day they presented a second petition to the Governor, asking a grant of the other four leagues.   Upon this petition the Secretary made a favorable report, and on the third of November, 1843, the Governor ceded to the petitioners the entire tract, and on the same day issued to them a formal grant of the premises.

The position of the appellants is that this grant was intended, not merely for the benefit of the grantees named therein, but also for the benefit in equal shares of all the members of the Berreyesa family—the fathers, brothers, and children of the grantees.   In support of this position they rely upon three circumstances :

*First*, the implied refusal of the Governor to grant the entire tract of eight leagues solicited in the first petition of the two Berreyesas ;

*Second*, the language of the second petition and the report of the Secretary made thereon ; and

*Third*, the recital in the grant itself.

We have carefully considered these circumstances, and do not find in them any support to the position taken.

1. There is nothing in the order of the Governor directing a title to issue to the petitioners for so much of the land solicited as they could " settle," which justifies the inference that he refused to grant the entire tract in consequence of the limited quantity of stock which the petitioners possessed.   The report of the Secretary upon the petition presented refers only to the character of the petitioners

and the improvements they had made or commenced.   It contains
no allusion to their property or ability to stock or otherwise use the
land.   Nor does the Governor intimate any reasons for the order
he made.   It is a sufficient answer to the argument which rests
upon the character of this order, to observe that no action was
based upon the order.   The grant which transferred the title was
not issued upon it.

2. The second petition presents circumstances for the considera-
tion of the Governor, in addition to those urged in the first petition.
The Berreyesas sought a grant of the tract of eight leagues, and
in their first petition they merely represented that they were mar-
ried, and had children, and also had a considerable number of cattle
and horses, and needed land on which to place them.   This repre-
sentation did not secure the desired concession.   The petitioners
therefore presented a second petition on the subject, in which they
put forward the further consideration, that their families were very
large, and included their parents, children, and brothers, and besides
that there were more than one hundred uncivilized Indians in their
neighborhood, whom it was necessary to maintain, and that the four
leagues ceded were insufficient for their purposes.   The report of
the Secretary upon this petition speaks of it as one presented for
the benefit of the petitioners, and of their parents, children, and
brothers; but the petition itself shows that the parents, children,
and brothers were referred to only as inducements for enlarging the
bounty of the Government.   It was necessary for the petitioners
to provide for their large family, and also for the maintenance of
the neighboring Indians, and therefore they asked for the entire
tract.   The report of the Secretary, read in connection with the
petition, only means that the petition showed that the parties, who
constituted the family of the petitioners, would be benefited by the
grant, not that the title was sought in the names of those parties.
The benefit to the parents, children, and brothers was one which
would flow from the means which the grant would furnish to the
petitioners for their support.

3. The recital in the grant does not control the direction of the
title.   The petition was presented by the two Berreyesas; the con-
cession of the Governor preceding the issuance of the grant in form

declares them by name to be the owners of the land; the grant designates them as the parties to whom the land is ceded; the conditions annexed refer to them alone; *they* are not to alienate or incumber it; *they* may inclose it; *they* shall enjoy it freely and exclusively; *they* are to build a house upon it; *they* shall solicit the juridical possession; *they* shall lose the right to the land if *they* violate the conditions; and it is to *them* that the grant in question is to serve as a title. Language could hardly be used, as counsel very justly observe, more absolutely excluding the idea that any other person than the two Berreyesas were to become invested with the title. The recital discloses the inducements which operated upon the Governor to make the grant, but these inducements have no effect upon the character of the grant or the course of the title. In *Frigue* v. *Hopkins* (4 Martin, N. S. 214) it was claimed that land granted to the ancestor of the plaintiff by the King of Spain was common property, and in considering the question presented, the Court said: " By the regulations of the Spanish Government, if the individual who applied for land was unmarried, a certain quantity of land was given to him; if he had a wife, this quantity was increased; and if he had children, an additional number of acres was conceded. Now, if the circumstance of his being married made the thing given become the property of both husband and wife, we must, on the same principle, hold, that where children were the moving cause, they too should be considered as owners in common of the land conceded. But that such was the effect of the donee having a family, we believe was never even suspected—it certainly is unsupported by law. Many donations are made, in which the donee's having a wife, and being burdened with a large family, is a great consideration for the beneficence of the donor; but this motive in him does not prevent the person to whom the gift is made from being considered its owner, nor prevent the thing given from descending to his heirs."

The Mexican Regulations of 1828 require the applicant for lands, whether he be an *empresario*, head of family, or private person, to set forth in his petition to the Governor " his name, country, profession, the number, description, religion, and other circumstances of the families or persons with whom he wishes to colonize ;" and

though these particulars constituted considerations with the author-
ities in whom the granting power was vested, it was never supposed
that they in any respect controlled the course of the title against
the operative words of transfer in the grant. To positions of this
nature the language from the Louisiana case may be repeated—the
cause moving to the grant " does not prevent the person to whom
the gift is made from being considered its owner, nor prevent the
thing given from descending to his heirs." As it " was never even
suspected," says the Court in that case, that the land granted
became common property, from the fact that the donee had a family,
so it may with equal truth be said in the present case, that it would
never be suspected, except for the very ingenious and learned argu-
ment of counsel, that the land granted was owned by the parents,
brothers, and children, in equal shares with the petitioners, from the
fact that they constituted a portion of the family of the latter.

The grant to Sutter and the petition upon which it was issued
furnish an illustration of the views we have thus expressed. The
grant and petition are both found in the report of the case of *Fer-
ris* v. *Coover* (10 Cal. 592). In the petition Sutter states that
he solicits the land for the enlargement of his enterprise and the
establishment of twelve families. The grant recites that he asked
the land for " his personal benefit and that of twelve families," and
cedes the land to him " for himself and his colonists." Yet the
Board of Land Commissioners held that the title vested solely in
Sutter, and that the peculiar language of the recital of the grant in
no respect impaired his rights, or conferred any special rights
upon the other settlers. In considering the nature of the grant,
Mr. Thompson, of the Commission, after observing that the Mexi-
can Regulation of 1828 makes no distinction in the legal effect of
the several classes of grants provided for by it, said : " The only
difference is in the purposes for which it is made, and the conse-
quent variance in the character of the conditions imposed or implied
by it. A grant to an individual imposed the condition of occupa-
tion or cultivation, as the consideration on which it was founded,
and was usually made to him for his own benefit and that of his
family ; but it has never been contended that the rights of the
grantee in the premises were in any degree impaired by the use of

this language, or that it conferred any special rights, legal or equitable, on his family. The full right of property vested in the grantee, subject only to the general provisions of the laws on the subject. So in the case of an *empresario* grant, it involved the condition of the introduction and settlement of the land of twelve or more families, according to his stipulation; and it might, as in the present case, be made to the grantee for his own benefit and that of his settlers; but the use of this language would not, any more than in the former case, confer any special rights on the settler. The words of grant apply to the grantee alone, and those which follow were probably inserted to indicate the nature of the grant and the purpose for which it was made." And again: " In relation to the terms and conditions on which the settlement was to be made, the regulations are entirely silent. The only provision we have been able to find on that subject is contained in the fourth article of the law of August, 1824, which simply guarantees the contracts which the *empresario* may make with his settlers, and imposes no restrictions on such contracts, further than that they shall not be contrary to the laws of the Republic. From this it would appear that the matter was left entirely to the *empresario*, to make such arrangements with the colonists in conformity with the law and objects of the grant, as might be satisfactory and advantageous to the parties. After a careful examination of this branch of the subject, we are satisfied that the effect of the grant was to vest the right of property in the grantee, Sutter, subject to the condition of settling twelve families on the premises granted; and that in making such settlements he was at liberty to make such contract with his settlers as might be mutually agreed on between them, provided they were not contrary to the law of the land, nor inconsistent with the purposes and intent of the grant."

The decree of the Commission confirming the title to Sutter alone, so far as it rested upon the grant mentioned, was affirmed by the Supreme Court of the United States; and we are not aware that the correctness of its views upon the nature and operation of the grant has been called in question by any tribunal.

Judgment affirmed.